NO. 07-02-0466-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



JANUARY 26, 2005



______________________________




BARBARA JEAN STANFORD, APPELLANT



v.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 410TH DISTRICT COURT OF MONTGOMERY COUNTY;



NO. 02-04-02382-CR ; HON. K. MICHAEL MAYES, PRESIDING



_______________________________



Before QUINN and REAVIS, JJ., and BOYD, SJ. (1)

 Presenting four issues for our decision, appellant Barbara Jean Stanford challenges
her conviction of murder by a jury as well as her court-assessed punishment of 55 years
confinement in the Institutional Division of the Department of Criminal Justice. In those
issues, she contends this court should: 1) reverse the trial court and dismiss the indictment
because the evidence is insufficient to sustain the conviction or, in the alternative, reverse
and remand the case for retrial, 2) reverse and remand the cause for retrial because
appellant was denied her right to due process of law in that both the State and prior
defense counsel inadequately investigated the case, 3) reverse and remand the case
because appellant was denied "a full continuance requested, thereby denying appellant the
additional time to locate witnesses and otherwise prepare for trial and resulting in
deliberations beginning on the Friday preceding a holiday weekend," and 4) reverse and
remand the case because appellant was denied a requested jury instruction regarding the
use of a specific deadly weapon rather than a single instruction stating alternate deadly
weapons. For the following reasons, we affirm the judgment of the trial court.

 The issues presented by this appeal require us to review the relevant evidence in
some detail even though it is somewhat lengthy. On August 9, 2001, the deceased, Thanh
Nguyen (Nguyen), a staff pharmacist at Houston Northwest Medical Hospital, failed to
report for work. According to the pharmacy manager, Marshall Steglich (Steglich), he had
worked with Nguyen since July of 1982, and this was the first time that Nguyen had failed
to show up for work at the appointed time. Because of Nguyen's absence, Steglich was
called to fill in for Nguyen. On his way to work, Steglich went to Nguyen's house located
some two to four miles from the hospital. Upon his arrival, he noticed some lights on in the
house and both of Nguyen's vehicles were parked on the street adjacent to the house. 
Steglich knocked on the door, but no one answered. He then drove along the route that
he thought Nguyen would have taken to the pharmacy, but did not see any sign of him, so
Steglich called Nguyen's sister, Diem Volz (Volz), who had been listed as a reference
number. Receiving a busy signal, Steglich drove to Volz's house and told her husband of
his concern about Nguyen's failure to appear for work. After Volz, her husband, and two
of Nguyen's brothers could not locate Nguyen, Volz filed a missing person's report with the
Harris County Sheriff's Department. In that report, she mentioned that Nguyen had
presented appellant as his girlfriend and that appellant had told them she wanted to marry
Nguyen. 

 Harris County Sheriff's Detective Jerry Davis Ferrell (Ferrell) conducted an
investigation in the course of which he learned that there were cash withdrawals from
Nguyen's ATM account as well as from his bank after August 9, the date of his
disappearance. On August 13, after Ferrell had been working the case all day, he received
a page at home from his sergeant notifying him that appellant had called the homicide office
inquiring about the progress being made on the investigation of the Nguyen case. Ferrell
contacted appellant, who he described as being very "agitated and defensive." She asked
Ferrell to meet her the next day at the Humble patrol station which was close to her home. 
He met her the next day, August 14, and they discussed Nguyen's disappearance. 
Specifically, Ferrell said:

 She told me that for four, four and a half years, she had had a relationship
with Mr. Nguyen that began when she had placed an ad in a local periodical,
newspaper or something like that, for an escort service; and subsequent to
that she had, in her words, tricked for him. She had provided sex for money
on a few occasions; and then thereafter, had provided other girls to prostitute
for Mr. Nguyen and that she had an ongoing relationship with him, whereby
she received the money in return for putting Mr. Nguyen in touch with girls for
himself or for other people, . . . .


Ferrell also averred that appellant told him that Nguyen had purchased a used automobile
for her use. He said that appellant then agreed to follow him to the homicide office for an
interview there.



First Written Statement

 Upon their arrival at the office, Ferrell said appellant agreed to give a written
statement about her relationship with Nguyen. In that statement, she said that appellant
would give her sums of money that were normally in the amount of $300, and sometimes
as frequently as every week. She also said that Nguyen had taken one of her daughters as
a deduction on his income taxes and additionally, in late November of 1999, had also given
her a cashier's check in the amount of $4,600. Further, Nguyen had given her some rifles
and bought a car "solely for her use and had placed her on his insurance." She admitted
she gave a false driver's license and lied to the insurance agent about Nguyen being the
father of her child. She also said that Nguyen had been stealing drugs from the pharmacy,
and that she accompanied Nguyen to Galveston a few times with her children for the
purpose of acting as a cover for Nguyen so he could sell the drugs. She admitted she had
used his ATM card to make purchases until the card was confiscated by the machine. 
When that occurred, she called the Harris County Homicide Office to inquire about Nguyen. 
She averred that the last time she had contact with Nguyen was on August 5 or 6 and the
last time she saw him was on July 29. 

Second Statement

 After taking the first statement, Ferrell averred he had no idea whether Nguyen was
alive or dead and continued to talk with appellant, which resulted in his taking a second
written statement from her. In that statement, appellant said that Nguyen told her, "I have
to get out of town for awhile so the heat will be off me." He admitted that he had stolen
$60,000 and could steal more, to which she replied, "[W]ell, if you weren't fucking people
out of drug money you wouldn't be in this boat." According to her, she said she did not want
to give any more information to the IRS or to the insurance agent. This made Nguyen very
angry and he threatened to have her children taken away from her, to which she responded 
that she would tell the hospital that he had been stealing drugs. Then, she said, things
"calmed down" and he ended up giving her money and the use of the credit card. 

 Appellant also said that about a year and a half ago, an Asian man had been asking
questions about her and her daughter. She told Nguyen about this and he replied that there
was some man he had cheated on a drug deal who was angry with him. She also referred
to some suspicious expenditures that had been made by members of Nguyen's family. In
addition, she said, Nguyen had given her some rifles, and she took them home and told her
husband Rickye that her sister Lisa had given them to her. Rickye did not want two of the
rifles, so she had him take those two to the pawn shop to sell them. She did not remember
if she still had the pawn ticket. 

 Ferrell testified that after taking the statements, he felt that there was something she
was being deceptive about, and "so long as she was willing to talk with me," he wanted to
talk to her some more. He asked her to return the next day, which was August 15. During
the course of that conversation, appellant admitted that "she had shot the victim and that he
was now dead." She had buried him in the back yard. Ferrell placed appellant under arrest
and gave her Miranda warnings. He then averred that appellant chose to give him a third
written statement.

Third Statement

 In her third statement, appellant said on August 2, 2001, Nguyen asked her to go to
Galveston with him so that he might "sell some more drugs that he had stolen from his job
at the hospital." She refused and that "pissed [Nguyen] off." She then said that an
argument followed, in the course of which Nguyen threatened to steal appellant's two
daughters and hide them in Vietnam and that he also wanted his car back. She replied that
if he wanted the car to come get it before she drove it into the river and that she would pull
it out on the street and he could get it there.

 She then said that Nguyen returned about 3:30 p.m. on August 3, 2001, and pushed
his way into the house. Appellant's one-year-old daughter started crying. Nguyen picked
the child up and the pair started struggling for possession of the child. She "grabbed her
revolver, Smith and Wesson .38 Special, silver-colored, [and] loaded." She pointed the gun
at Nguyen and told him to give her the baby, which he refused to do. She shot him in the
left temple, threw the gun on the floor, and proceeded to try to settle her daughter down. 
After doing so, she said, she got a kitchen knife, cut the hall carpet around the body and
rolled the body in it.

 She then dragged the carpet roll with the body out the front door and put it in the back
of her trailer. She returned to her house, cleaned up the blood, cut up the rest of the
hallway carpet and put it with the body. She proceeded to drive Nguyen's car to a K-Mart
parking lot and took a cab home. Upon her arrival, she dug a hole behind the trailer, put the
body and the carpet in it, "poured some diesel fuel on top," and set it afire. She averred that
it burned down until "there was almost nothing there." She said that it was not unusual to
burn trash in her neighborhood.

 On August 5, appellant said she cleaned her revolver, "threw the fired cartridge in the
San Jacinto River," and placed the gun in her desk. On August 8, appellant got her
neighbor "Jorge" to aid her in going to get Nguyen's car from the parking lot and return it to
the front of Nguyen's house. She said, "I didn't tell the whole story earlier because I had
been afraid that I would lose my kids." In addition to the statement, she drew a diagram
showing the location of the burn pile and a diagram of her desk showing where the gun was
located.

 After Ferrell had obtained the statements and the diagram, he called the Montgomery
County Sheriff's Office, relayed the information obtained from appellant, and asked them to
take custody of appellant. In response to that call, Montgomery County Sheriff's Detectives
Carey Mace, Bill Bucks, Lisa Pickering, and Lieutenant David Moore went to appellant's
trailer house in Montgomery County before they took custody of appellant. Appellant's
husband Rickye was there and gave the deputies permission to search the house and the
adjacent area. When queried whether he or appellant had a gun, Rickye produced a Smith
Wesson .38 caliber revolver from a space on a desk near a computer monitor.

 Montgomery County Sheriff's Detectives Buck and Pickering then went to pick up
appellant at the Harris County Sheriff's Office, took her to a magistrate to have her rights
read to her, and then proceeded to the Montgomery County Sheriff's Office. Upon their
arrival there, appellant told Pickering that she wanted to amend her previous statement. 
She was given her Miranda rights.

Appellant's Fourth Statement

 In this statement, dated August 16, 2001, appellant said that although she told her
husband on August 10, 2001, what had happened, they did not call the police because they
were afraid for their children. After she told her husband, he was "very upset and scared."
She dug up "the stuff," bagged it, and "took it to a dumpster in Humble." She and her
husband then filled up the hole in their yard and put grass seed over it. In ending this
statement, she said: "I have done . . . horrible Godawful things that I can never change,
I am truly sorry and wish that I could go back and change things and know that I will always
think of this and pay inside for doing such horrid things. I am truly sorry and suffering from
this."

Appellant's Fifth Statement.

 On August 17, 2001, appellant again asked to talk with Detective Bucks. After again
receiving her Miranda rights, Bucks averred that appellant told him "she had forgotten to tell
us about a pipe wrench that the victim had fallen on and there was a lot of blood on it and
that she had gotten rid of the wrench by throwing it off a bridge." Bucks then informed her
that another detective had found some "medium velocity impact blood splatter" generally
associated with a beating or stabbing, in the hallway of appellant's house and because of
that, he did not believe her. He said appellant then became "[v]ery angry" with him and he
terminated the interview because he did not believe she was being honest with him.

 On August 22, 2001, Bucks said appellant again asked to speak with him. After 
receiving her rights, appellant gave another written statement. In that statement, appellant 
gave an account of her activities and, in some respects, amended portions of her earlier
statements. In relevant part, she said:

 I picked up a large wrench which was lying on the floor next to the air
conditioner. I struck Thanh [Nguyen] on the left side of the head with the
wrench. Thanh turned around and said you're going to jail now for hitting me
and I'm going to get the kids. Catherine was screaming and trying to get
away from Thanh, so I hit him again with the wrench which knocked him to his
knees. Catherine was still screaming, but Thanh would still not let go. I hit him
a third time with the wrench in the head and Thanh fell backwards and let go
of Catherine. Thanh fell onto his back, trapping Catherine's lower legs
underneath his butt area. Thanh was trying to pull Catherine up on his chest
and said 'I'm going to hurt Catherine like you hurt me.' I dropped the wrench
on the floor and picked up the pistol that I had dropped and pointed it at
Thanh's head from approximately two feet away and fired the pistol one time
hitting Thanh on the left side of his forehead near his temple. Thanh did not
move much after that.


In this statement, appellant additionally explicated what she did after she shot Nguyen as
follows:

 I only cut the first five or six feet of the carpet out of the hallway at this time. 
I dragged the rolled up carpet out of the front door of my home and dragged
it into the backyard. There was a hole in the ground on the south side of our
trailer from a stump being removed. The hole was about two to two and one-half feet deep already. I dug the hole about six to eight inches deeper. I then
dragged the rolled up carpet with Thanh in it into the hole. I put some wood
fence pickets on top of the rolled up carpet.


 Appellant went on to say that there was blood on a bookshelf in the hallway so she
took it out and put it on top of the fence pickets, then put diesel "gasoline" on top of the
pickets, let it set for ten to fifteen minutes while she went back into the house to clean up the
blood in the hallway. While she was there, she noticed blood on a clothes basket full of
books in the hallway which she also placed on the fire. The next day, August 4, 2001, with
the aid of her husband, whom she said did not know about the homicide at the time, she put
some old clothes and plastic toys on the burn pile, added some more diesel fuel, and relit
the fire. On August 7, 2001, around noon, appellant said she put more items on the burn
pile, added more "diesel gas" and lit the fire. Later, about 3:00 p.m., she said she dug up
the burned remains and put them in the backyard beside the trailer. On August 11,
"because they were beginning to stink," she took the bags to a dumpster at an apartment
complex in Humble. 

 Appellant also said that on August 6 , 2001, she asked her friend Jorge "to help
move a T.V. from a friend's house," and they went to Nguyen's house. Once there, she told
Jorge that he could take whatever he wanted because the friend owed her money. The pair
took several items from the house, including eight rifles, and then went to an ATM machine
where she "pulsed" $300 using Nguyen's Visa debit card. She used the same card again
on three other occasions obtaining $300 each time, which she used to purchase various
items, including a riding lawnmower which was later recovered at her home. On August 13,
2001, she asked Jorge to accompany her once more to Nguyen's home to help her move
a television set. However, upon their arrival, the doors were locked and she remembered
she had left her keys inside the house on her earlier trip. She later called Nguyen's employer
and was told he was missing. She then called the sheriff's office, which resulted in her
conversation with Ferrell.

Appellant's Sixth Statement

 On August 24, 2001, appellant again asked to speak with Detective Bucks. He was
not available so she spoke with Detective Mace, who took another written statement from
her. In this statement, she explained where she had disposed of the shell casing from the
pistol, the wrench, and a laptop computer she had purchased with some of the money taken
from Nguyen's ATM account. She also gave additional information about her activities since
the incident. She ended this statement by exonerating her husband by saying, "My husband
had no idea what I had done, and was innocent of all the things that happened  . . . ."

 As additional evidence supporting the jury verdict, the State points to testimony from
appellant's sister that appellant phoned her from jail and admitted to her "that she killed a
person because he was going to take her baby and leave and go to Vietnam." It also refers
to testimony by a reporter stating that appellant had admitted to him that she shot Nguyen,
took his body to a stump hole, then returned to her house and cleaned up. However, she
made no reference to the use of a wrench. The State further refers to the evidence that
DNA tests of the blood splatter material taken from the hallway of appellant's home matched
the DNA of skin cells taken from an electric razor obtained from Nguyen's house. 
Additionally, it emphasizes a written statement by appellant's husband in which he says that
appellant told him that on August 3, 2001, "she had removed a problem, a man who had
threatened her and our kids." 

 In the statement, appellant's husband also said that he had helped burn things on the
pile started by his wife, and that on August 13, 2001, he bagged "smelly mud" from the burn
pile and disposed of it in an apartment complex dumpster in Humble. He said that on
August 9, 2001, appellant asked him to discard a pipe wrench that "[s]he said had blood on
it and she had cleaned it off, but she wanted it gone." He described the place where he had
thrown it. The police located a wrench where he said he had discarded it and DNA tests of
blood taken from the wrench matched that of Nguyen. There was police testimony that the
"medium velocity" blood splatter found in appellant's hallway was in a manner that generally
indicated a beating. 

 There was further testimony that eight bone fragments found in the burn pile in
question were identified as human bones, as well as testimony by Nguyen's sister that an
unusual ring found in the burn pile belonged to Nguyen. Family photos received into
evidence showed Nguyen wearing a similar ring on his middle finger.

 Reiterated, in her first issue, appellant contends that we should reverse the trial court
and dismiss the indictment against her because the evidence is insufficient to support the
conviction or, in the alternative, we should reverse and remand for a new trial. We will
consider this contention as raising both legal and factual insufficiency issues. In assessing
the legal sufficiency of evidence to support a conviction, as articulated in Sanders v. State,
119 S.W.3d 818, 820 (Tex. Crim. App. 2003), we must determine whether, after viewing the
evidence in the light most favorable to the verdict, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. The court also instructs that
this standard is meant to give full play to the jury's responsibility to "draw reasonable
inferences from basic facts to ultimate facts." Id. at 820; see also Jackson v. Virginia, 443
U.S. 307, 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560 (1979).

 In supporting her legal insufficiency argument, appellant points out that the evidence
presented by the State was predominantly circumstantial in that no body was ever discovered
and no witness to the murder testified at trial. She recognizes that the State presented her
extrajudicial statements, but argues that the statements were inconsistent and changed over
a period of time, with the changes being correlated with information given her by law
enforcement personnel and her husband. Considering that, appellant argues that the other
evidence is not sufficient to prove the corpus delicti of the underlying crime of murder.

 The corpus delicti rule is one of evidentiary sufficiency that provides that an
extrajudicial confession of wrongdoing, standing alone, is not enough to support a conviction
and there must be other evidence demonstrating that a crime has in fact been committed. 
That other evidence is commonly referred to as the "corpus delicti." The rule does not
require independent corroboration of each element of the underlying crime but rather that
there be some independent evidence tending to show the essential nature of the charged
crime. The other evidence need not be sufficient by itself to prove the offense, but must be
sufficient to render the commission of the offense more probable than it would be without the
evidence. Salazar v. State, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002); Rocha v. State, 16
S.W 3d 1, 4 (Tex. Crim. App. 2000). The historical justification of the rule in a murder case
such as this one is to guard against the deleterious effect upon the criminal justice system
if a murder victim suddenly reappeared after his self-confessed murderer had been tried and
executed. Salazar v. State, 86 S.W.3d at 644.

 The evidence showed that on August 9, 2001, Nguyen failed to show up for work for
the first time in his 19 years employment at the pharmacy at the Northwest Medical Hospital
and has never again been seen by his manager or family. In her fifth statement, appellant
said she had killed Nguyen by hitting him with a wrench, rolled his body in a carpet and
dragged him to a hole in her backyard which was set afire. She also said that things in the
hole were set afire on three different occasions. She further admitted that the remains were
later bagged and taken to a dumpster in the parking lot of an apartment complex. There was
evidence that the blood splatter found in the hallway of appellant's house was of the type
generally associated with a beating, and DNA tests showed that the blood in the splatter, as
well as the blood on a ten-pound wrench, matched the DNA taken from skin cells found in
Nguyen's razor. Additionally, human bones and an unusual ring identified by Nguyen's sister
as his and which was shown in a photo were also found in the burn pile. Suffice it to say that
the evidence other than the extrajudicial confessions is amply sufficient to satisfy the
requirement of the corpus delicti rule. Moreover, in her extrajudicial confessions, while
changing somewhat in the details of the crime and her reason for committing it, appellant was
consistent in admitting that she actually killed Nguyen. Those confessions were sufficient
to establish her identity as the perpetrator of the crime. Emery v. State, 881 S.W.2d 702, 706
(Tex. Crim. App. 1994). Viewed in the light by which we must view it, the evidence in this
record is both legally and factually sufficient to sustain the jury's guilty verdict. Appellant's
first issue does not reveal reversible error and is overruled.

 As noted above, in her second issue, appellant contends her constitutional due
process rights were violated because the State failed to thoroughly investigate the case,
including the possibility that someone else might have committed the crime. This contention
is intertwined with the argument that appellant's first trial counsel provided her ineffective
assistance. With regard to the asserted "due process" failure of the State to adequately
investigate the case, we note that the record does not show this contention was ever
presented to the trial court by a motion for mistrial, objection to the testimony of any officers,
motion for new trial, or otherwise. Accordingly, the issue has not been preserved for
appellate review. Tex. R. App. P. 33.1; Johnson v. State, 963 S.W.2d 140, 142 (Tex.
App.-Texarkana 1998, pet. ref'd). 

 We recognize that there are a few constitutional rights so integral to the operation
of the system that inaction will not result in waiver. See Hawkins v. State, 964 S.W.2d 767,
769-70 (Tex. App.-Beaumont 1998, pet. ref'd). However, under this record, the State's
investigative procedure is not shown to fall within that type of exception. The record shows
that appellant confessed to all the elements and evidentiary facts of the murder charge. She
stated six times unequivocally that she alone murdered Nguyen by either shooting him or by
hitting him with a wrench three times and then shooting him. When a defendant
unequivocally admits or confesses to a crime, those admissions or confessions are direct,
not circumstantial evidence of a crime. Ridyolph v. State, 545 S.W.2d 784, 789 (Tex. Crim.
App. 1977). 

 Additionally, the confessions were corroborated by the evidence about DNA profiles
of the blood stains and blood splatters we mentioned in our evidentiary recap, and there was
evidence that human bones were found in the burn pile identified by appellant, along with an
unusual ring owned by Nguyen. The confession statements about appellant's relationship
with Nguyen were corroborated by a Nguyen family picture received into evidence showing
appellant and her child with the group, as well as a photo album found at Nguyen's home,
labeled "Rebecca" Stanford Nguyen (appellant's daughter), containing pictures of appellant
and her daughter. There was also the evidence of ATM pictures showing appellant using
Nguyen's ATM card, and that Nguyen's car insurance covered appellant as a driver of the
car Nguyen assertedly bought for her. If, indeed, the State's investigative procedure violated
appellant's right to due process and a fundamentally fair trial, her remedy is through a post-
conviction writ of habeas corpus. See Ex parte Mowbray, 943 S.W.2d 461 (Tex. Crim.
App.1996); Ex parte Brandley, 781 S.W.2d 886 (Tex. Crim. App. 1989).

 With her claims of insufficient investigation by the State, appellant also intertwines a
claim of ineffective assistance of counsel. In buttressing that claim, she relies upon the
proposition that to render effective assistance in a criminal case, counsel must conduct an
independent investigation to determine if law enforcement personnel pursued all information
that could shed light on the charged offense, or whether they only pursued information
consistent with a preconceived determination of the guilt of the accused. See, e.g., Ex parte
Brandley, 781 S.W.2d at 890-94. 

 Specifically, she asserts that her first defense counsel failed to:

 1. Inspect the State's physical evidence.


 2. File sufficient pretrial motions.


 3. Be present at a pretrial hearing held on December 14, 2001, although he
was present for the arraignment hearing on December 17, 2001.


 4. Inspect appellant's mobile home before it was moved from the property, or
"preserve it in its August 15, 2001, state for defense examination."

 

 5. Identify and locate defense witnesses, including Harris County Sheriff's
Sergeant S.D. Ruggiero and Israel Reyes, in time for them to testify at trial.


 6. Retain any expert witnesses.


 The standards by which we evaluate ineffective assistance of counsel are articulated
in the seminal case of Strickland v. Washington, 466 U.S, 668, 689, 104 S.Ct. 2052, 80
L.Ed.2d 674 (1984). In Hernandez v. State, 988 S.W.2d 770, 772-74 (Tex. Crim. App. 1999),
the court provided that the Strickland standards are applicable in Texas to determine claims
of ineffective assistance of counsel. The Strickland court explained that the purpose of the
Sixth Amendment guarantee of effective assistance of counsel was "simply to ensure that
criminal defendants receive a fair trial." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. 

 To determine if counsel's performance met that standard, the Strickland court
promulgated a two-prong test usually stated as: 1) whether her counsel's conduct was
deficient; and 2) whether but for counsel's deficient performance, the result of the proceeding
would have been different. See Hernandez, 988 S.W.2d at 770 n.3. The high court also
articulated that an error by counsel, even if professionally unreasonable, would not warrant
setting aside a judgment in a criminal proceeding if the error had no effect on the judgment
and, to demonstrate the requisite prejudice, an appellant must show that there is a
reasonable probability that, but for the errors, the result of the proceeding would be different. 
The court defined a "reasonable probability" as one sufficient to undermine confidence in the
outcome. Strickland v. Washington, 466 U.S. at 691, 104 S.Ct. 2068. In Boyd v. State, 811
S.W.2d 105, 109 (Tex. Crim. App. 1991), the court cautioned that absent both showings, a
reviewing court cannot conclude that the conviction resulted from a breakdown in the
adversarial process that renders the result unreliable.

 The record before us simply does not justify a conclusion that, but for any of the
alleged errors on the part of appellant's first counsel, the result of her trial would have been
different. This is particularly true in view of the fact that appellant signed six confessions that
she murdered Nguyen by herself, the evidence corroborating those confessions, and her
exoneration of her husband in any participation in the murder. We also note that the record
shows that her trial counsel had five weeks to prepare for trial and mounted a vigorous
defense in the course of which he presented some 15 witnesses. Issue number two is
overruled.

 In her third issue, as we noted above, appellant posited that we should reverse and
remand this case for a new trial because of the trial court's refusal to grant her a two- week
continuance and instead granted a one-week continuance. She was harmed, she argues,
because the refusal to grant the full continuance denied her additional time to locate
witnesses and "otherwise prepare for trial" and "resulted in deliberations beginning on the
Friday preceding a holiday weekend . . . ."

 As appellant recognizes, the determination whether to grant a motion for continuance
is within the court's discretion. Corley v. State, 582 S.W.2d 815, 820 (Tex. Crim. App. 1979). 
She also recognizes that she has found no authority that deliberations beginning on the day
before a holiday would lose rationality as a result. Moreover, the record does not show that
this particular argument was ever presented to the trial court. As we have noted above, Rule
33.1(a) of the Rules of Appellate Procedure requires that to preserve a matter for appellate
review, a timely request, objection, or motion must be made that states "the grounds for the
ruling that the complaining party sought from the court with sufficient specificity to make the
trial court aware of the complaint, unless the specific grounds were apparent from the
context" and that the trial court ruled or refused to rule on the matter. That being true, that
question is not before this court for decision.

 We are then relegated to determining whether by making only a partial grant of the
motion, the trial court abused its discretion. The record reveals that the trial court heard a
motion to substitute trial counsel on April 12, 2002. At that time, the court granted the motion
with the admonition: "We're set for trial in May. We're not going to be postponing the trial
because of new counsel, so either work it out or go to trial." Regardless of the judge's
comment, appellant filed a motion for continuance on May 9, 2002, in which it was asserted
that co-counsel had a conflict with the May 13, 2002 trial date and she needed the presence
of co-counsel at the trial and, further, there was not adequate time for her experts to examine
"[e]vidence that should be in the possession of the prosecutor [that] is not in the prosecutor's
file." She requested a two-week continuance for those purposes. Upon a discussion with
counsel about what needed to be done, the trial court granted a one-week continuance.

 On May 16, 2002, the trial court held a hearing on appellant's motion to suppress. 
The court concluded the hearing with the comment: "See y'all Monday, [the trial date
previously set] at right around 1:00 o'clock. Okay?" Further, at the beginning of voir dire on
the trial date, appellant again did not raise her concerns. After examining the entire record
in this case, we cannot say that the trial court abused its discretion in refusing to grant the
full continuance requested. Appellant's third issue is overruled.

 In her fourth issue, appellant contends the trial court reversibly erred in refusing her
requested jury instruction regarding the use of a specific deadly weapon rather than a single
instruction stating alternate deadly weapons. In the instruction given, the jury was told it
could find that appellant "intentionally or knowingly cause[d] the death . . . by shooting him
with a firearm or by striking him with a wrench . . . ." The same instruction permitted
appellant's conviction if the jury found that appellant "with intent to cause serious bodily injury
. . . committ[ed] an act clearly dangerous to human life, by shooting him with a firearm or by
striking him with a wrench that caused the death . . . ."

 In support of this argument, appellant points to what she describes as the inconsistent
statements in her various confessions concerning the manner of the victim's death. She
notes the statements in some confessions indicating that he was shot with a firearm with
those stating that the victim was struck with a 24-inch long, ten-pound pipe wrench. Her
requested instruction would expand the instruction to contain four alternatives rather than
two. She reasons that if her requested instruction had been given, it would have "called the
jury's attention to the conflicting evidence regarding how the victim died." Noting that the jury
had evidence of the strength of appellant's husband, she reasons that the jury could see
appellant at the defense table and form an opinion as to her strength. Thus, she continues,
the jury "focused on that strength comparison and the conflicting evidence presented, would
have to consider whether the 5-foot, 5-inch tall, 110 pound female could have swung the 24-inch long, 10-pound pipe wrench at a speed of 5 to 25 feet per second, in a hallway, under
a 7-foot, 5-inch high ceiling."

 Appellant's only trial objection was "I object to the compound nature of the charge on
the two alternates found in the indictment" without amplification as to the basis of that
objection. We have stated above her appellate contention. We agree with the State that
appellant's suggested submission for the purpose she suggests would effectively violate that
portion of Texas Code of Criminal Procedure article 36.14 which provides that a judge should
deliver a charge "not expressing any opinion as to the weight of the evidence, not summing
up the testimony, discussing the facts or using any argument in his charge calculated to
arouse the sympathy or excite the passions of the jury." Tex. Code Crim. Proc. Ann. art.
36.14 (Vernon Supp. 2004-05). Appellant's fourth issue is overruled.

 In sum, all of appellant's issues are overruled, and the judgment of the trial court is
affirmed. 

 John T. Boyd

 Senior Justice


Do not publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. 
Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004-2005).